The fourth case for argument is Melissa Wanna v. RELX Group, et al. All right, Mr. Maggett, we'll hear from you. Good morning, Your Honor. May it please the Court, I am Dave Maggett, and I represent the appellant Melissa Wanna. Appellant appeals the district court's dismissal with prejudice of her claims against LexisNexis for two primary reasons clearly supported by the allegations set forth in the complaint. The first reason we appeal is on the issue of direct liability. So Melissa, there's much to be said during this case of agency and aiding and abetting and different theories of why LexisNexis would be liable for the actions of my life. However, this glosses over one key point, which is the complaint itself asserts these claims both directly and indirectly against LexisNexis. So specifically with regard to the Driver's Privacy Protection Act, this statute forbids the release of confidential driver information to a third party without a permissible purpose. And the reason for this very closely mirrors the Wanna case in that an actress was stalked and killed as a result of some information that was improperly released about her driver's information, including her address and other related information. So in this case, the actual violation of the act occurred several times. But first, the first instance of the violation occurred at the point that Lexis illegally obtained the information as set forth in the facts in the complaint from the Minnesota Department of Public Safety and then released that information without a permissible purpose to MyLife. MyLife is an organization which has been sued by the Department of Justice, placed into bankruptcy receivership. I mean, it is by any accounts a cyber extortion racket. It has no permissible purpose, and Lexis has no permissible purpose for giving Ms. Wanna's information to this known cyber extortion firm. And that in itself, in and of itself, I should say, is violation number one. Certainly the complaint alleges that MyLife went ahead and then sold that information to other individuals, again, with no permissible purpose whatsoever. What information are you talking about? Specifically her drivers, the information which was obtained from the Minnesota DMV, information such as her home address, her information about her vehicles, her... Where is that alleged? Excuse me, sir? Where is that alleged, that the home address was... Yes, I can find that specific portion of the complaint. If you just give me one moment, I'm sorry. There's a reference to getting records. But you seem to think it's more specific than that. Or do you just mean that the word records encompassed a home address in your... Certainly, I would argue that the address was part of the records that were obtained from the DMV. However, in paragraph two, it says, including the release of her protected address to an abusive ex-spouse. And I believe... Paragraph two. Paragraph two of the complaint. Consumer data was sold by Lexis. Meaning the damages including... But how is that connected to the driver's claim? The driver's... The driver's act claim. Yes, absolutely. So that particular record was part of the data that was obtained through the DMV. There was no other... Let me put it this way, I guess. There was no other source of that information other than through the DMV. Because the only... Ms. Juana, which is also alleged in the complaint, was very protective of this address. Due to a relationship with an ex-spouse. Or concerns, I should say, over an ex-spouse. So obviously, like, My Life did not hold themselves out as a cyber extortion firm, right? They didn't say, that's what we do. We're in the cyber extortion business, right? They didn't go to Lexis and say, hey, sell us this data. Because, you know, they had to say, we have some legitimate business. Or Lexis was just selling it to anybody who came along. Which, if they were selling it to just anyone who came along, then your argument about that they would have to have a permissible purpose that would be lawful.  That's a problem. Do we know what was going... Yes. Who My Life represented themselves to be or how it came to pass? Yes, we certainly touch on this in the complaint. So I would argue that Lexis could have been legitimately duped. Certainly could have been legitimately duped early on. And Lexis and the complaint itself doesn't assign any liability to Lexis for being legitimately duped. However, it later became clear, and this is, I believe, well pled in the complaint, it later became clear that My Life indeed was in this business as evidenced by being charged by the DOJ and later settling that case, entering into a consent decree that this is indeed what we're doing. And then they continue to sell to them. This is the shocking fact and where liability attaches. You know, I think we do a pretty good job in the complaint of alleging how all that happens. But at the point that they continue to supply, and I know those terms are in the complaint, continue to supply after the DOJ says, hey, you know, these guys are running a cyber extortion scheme. And they continue to supply them this information. And was Ms. Juana's information provided after that notice? I don't know that that is alleged. Yes. Yes, I'm sorry. That is alleged. That is alleged? Okay. Yeah. I mean, I've read the complaint, but I'm not sure. Yeah, I know. Your Honor, I, man, that is tight. I can see, I believe it is, but I'm guessing. Okay, thanks. I mean, the words are what they are. I can read them, sort of. Yeah. So at any rate, you know, what I liken this to is, you know, somebody's shooting a gun in the street and another person is handing them bullets. And the way that the things have shaken out and the way that this complaint was dismissed was essentially because the individual handing them bullets wasn't deemed to be an agent for, I would argue the analysis there is actually for contract purposes. Because they weren't alleged to be an agent for contract purposes, they can hold no liability for handing them the bullets that, you know, this person is wildly firing into a crowd. I don't think that Minnesota law supports that in any way, shape, or form. We were admittedly kind of pigeonholed into this argument of having to defend the agency allegation that is made in the complaint. And we certainly use the term agent, that my life was Lexis' agent for the purpose of sale. We certainly use that term. Don't deny it. That term was meant to be used in a more colloquial sense than a traditional contracting sense. Like, you know, there's no allegation anywhere in the complaint that my life could be bound, or excuse me, Lexis could be bound as an agent in any contracting as a result of, you know, my life's action. That's not the allegation there. They're agent for the purposes of sale. Now, again, that's a colloquial use, similar to, we hear this term all the time with artificial intelligence now, agentic, agentic AI, meaning going out, doing something for somebody else. It doesn't necessarily mean, and isn't taken in common American parlance, to mean I am an agent for legal purposes of binding this person. We don't allege that, nor is that necessary to allege in the complaint. And, in fact, I think that flies right in the face of Twombly and Iqbal, which specifically address the issue of mere labels and conclusions. At this stage in the pleadings, we're not looking at mere labels and conclusions. We're looking at the facts set forth in the complaint. And I would argue that the facts, looking at the facts in this complaint, we certainly set forth a plausible standard for liability under the statutes, both directly and, I would even go so far as to say indirectly as well, specifically for the later acts of my life. And, sorry, I got caught up in time there. Specific acts, I'm sorry. I guess I'd leave the remainder of my time for rebuttal then. You may. Thank you, Your Honor. Mr. Davey, you may proceed. I'll bring this down just a little bit. There we go. Thank you, Your Honor. May it please the Court. Joshua Davey of the Trautman Pepper Law Firm from Charlotte, North Carolina. Nice to be with you this morning here on behalf of the appellees. This Court should affirm the decision of the District Court. Judge Schultz's well-reasoned decision focused on the real issue alleged in the complaint, which is Ms. Juana's agency theory of liability, and correctly dismissed Ms. Juana's claims for failure to plausibly allege that my life was Lexis Nexis's agent. Judge Schultz recognized that the legal theories as pleaded in the complaint are all efforts to hold Lexis Nexis liable for alleged conduct by MyLife, specifically an alleged extortion scheme that Ms. Juana has claimed MyLife was running, by which it would sell information and then try to sell again to its purchasers by having them pay a second time to have that information either modified or taken down from the website. And Judge Schultz recognized that these are allegations about a scheme that MyLife was allegedly engaged in, in fact, but that Ms. Juana couldn't pursue MyLife here because MyLife declared bankruptcy in 2022, at which time Mr. Madgett had a putative pending class action against MyLife, raising essentially the same claims that are made in this case, to which Lexis Nexis was not a party, and which did not contain any allegation that Lexis was a principal or a joint tortfeasor with MyLife. But evidently not satisfied with the option of pursuing MyLife in bankruptcy, Ms. Juana took that complaint, dusted it off, tacked on some agency allegations, and filed it in this case. On appeal in her brief, Ms. Juana barely contests Judge Schultz's analysis of the agency issue, and instead she's pivoted to a new kind of an argument that she calls a joint tortfeasor liability. That was an unpleaded theory that was never raised in the district court and isn't properly before this court. But whether the court views the complaint through the lens of agency or joint tortfeasor or direct liability, as we've heard from Mr. Madgett this morning, regardless, Judge Schultz was right. There are no plausibly stated allegations against Lexis Nexis in this complaint, and therefore his decision should be affirmed. I'd like to turn first to the theory that Ms. Juana has advanced in her briefs on appeal for the first time, which is this joint tortfeasor theory of liability. Ms. Juana waived that argument because it was never presented to the district court. The term joint tortfeasor, or either of the words, in fact, joint or tortfeasor, do not appear in the complaint. They were not presented in any briefing that was filed in the district court. There was an argument on Lexis Nexis's motion to dismiss. Ms. Juana's counsel did not appear for the argument and so, therefore, did not present it at oral argument either. And for that reason alone, it's not properly before the court. But even if the argument was properly presented, it would fail on the merits. So in order for joint tortfeasor liability to exist under Section 876 of the Restatement of Torts, which is the section that Ms. Juana relies on, the alleged joint tortfeasor must both know that the other party's conduct is tortious and give substantial assistance or encouragement to the other party in accomplishing the tortious result. Now, the complaint doesn't allege these things. It doesn't allege that Lexis Nexis was aware that My Life was engaged in tortious conduct. And that's an important point because it's not enough that Lexis Nexis might have been aware that My Life was selling information that it had obtained from Lexis Nexis. It had to know that My Life's behavior was tortious, the tortious nature of the conduct. Mr. Maddux made reference to the DOJ complaint. That doesn't establish that Lexis Nexis was aware of the tortious nature of My Life's conduct. Of course, a complaint is just a complaint. It's just allegations. My Life ultimately resolved its claims with the DOJ, but what I think it's telling is that the DOJ never took the position that Lexis Nexis was a joint tortfeasor and never took the position that Lexis Nexis was an agent. But even if, even if you assume for a moment that there was some possibility of knowledge, which I don't think is pleaded, and I don't think the complaint says it, the complaint still fails to allege substantial assistance that would be necessary to establish this joint tortfeasor liability theory. Because substantial assistance requires that Lexis Nexis, in this situation, take affirmative steps to encourage achievement of the tortious result. And the Minnesota Supreme Court has made clear in the Matthews v. Eichorn case we cited that even knowledge of a violation combined with inaction does not constitute substantial assistance. And there are just no allegations in the complaint here that Lexis Nexis provided substantial assistance to My Life to further some kind of conspiracy or tortious scheme or racketeering activity. Instead, what you see in the complaint and in particular the 2011 reseller agreement which is incorporated into the complaint between Lexis and My Life is an arm's length business relationship. It's a licensing agreement by which My Life purchased a license to use certain data from Lexis Nexis that had been combined with other data to do all of the things that are alleged in the complaint. And that contract just reveals an ordinary, you know, commercial relationship between the parties, not one of joint tort feasors. Counsel, does the record indicate what specific data was transferred under that agreement? What type of data? I'm sorry, Your Honor. I couldn't quite hear your question. Does the record tell us what specific data or type of data was transferred under that agreement? It's not alleged in the complaint, Your Honor. There are a few points alleged. You know, there are references made to Ms. Wanda's address, for example, but the complaint doesn't even specify where that came from. To the DPPA point, it doesn't allege that it came from a DMV as opposed to the White Pages or some other source. And so, to answer your question, no, the specific data points that were provided as it relates to Ms. Wanda are not in the record. So for that reason alone, Your Honor, I think the Court can affirm Judge Schultz's decision right there, because what Ms. Wanda has presented to this Court on appeal was a brand new theory, never raised. That's not properly before the Court, but even if the Court were to consider it, it doesn't establish the liability of LexisNexis. But even if the Court were to go a step further and look at the agency theory that was pleaded into the complaint, it should affirm that theory as well. Judge Schultz correctly analyzed this issue and articulated that there's three elements to an agency relationship. There's authority. There's action by the agent on the principal's behalf. And then there is control of the agent by the principal. And Judge Schultz got it right when he said that there's no plausible allegation of authority here that could sustain a principal-agent relationship between my life and LexisNexis. Why do I say that? Well, there's three ways you can show authority for purposes of agency. There's actual authority. There's apparent authority. Or there's the doctrine of ratification, whereby one who does not actually have authority has their actions ratified by the purported principal. But none of those three are plausibly alleged here. Actual authority, as this Court explained in New Millennium, can only exist if there's actual consent by the principal that the agent should be able to act on its behalf. And that's not alleged in the complaint. Ms. Wanna can't allege it, in fact, because the 2011 reseller agreement, again, expressly disclaims any agency relationship between the parties and reveals that what we have here is an arm's-length commercial relationship. Further, with respect to apparent authority, that can only exist if there is action by the principal, the purported principal, that in some way reasonably causes a third party to believe that the agent is working on behalf of the principal. But there are no allegations in the complaint that Ms. Wanna or anybody else reasonably believed My Life was acting with the actual authority of LexisNexis. And there's no allegations that LexisNexis did anything to manifest to Ms. Wanna or to anyone else that My Life had the authority to act on its behalf. You know, in some, Your Honors, there's just no — you don't see any of the hallmarks of a principal-agent relationship as alleged in the complaint. You don't — The question I've got is that there seems to be an argument that could be made that whatever the plaintiff was making a claim about, that when they came up here and they said, well, we're not talking about agency in the ordinary contract relationship, and I'm going, well, isn't that what agency is really all about? Isn't that how one is made responsible for the contracts and torts of another? Right? I mean, if they're not your agent, and we're just using the term colloquially, what's — what does that mean? And doesn't that mean that what they said, yeah, we're giving all that up and we're really talking about is joint tort fees or aiding and abetting in their common law conspiracy theory? Isn't that all that's left on the table at this point? I think it is all that's left on the table. I don't think the agency issue has really even been presented to the Court on appeal. I mean, it seems like it's been abandoned here on appeal. Yeah. Because I think when you say the agency thing is colloquial, you're just telling us, well, there really is no agent relationship. There's no agent relationship. Right? Right. And so now the question really is, is what is there out there about this conspiracy? And it seems that what their allegation is, is that there was — they may have been duped originally, but that at some point they became aware of the lawful, the unlawful nature of MyLife's use of the data. And at that point, they had entered into an agreement to provide data, that by providing the data with knowledge that it was going to be used unlawfully, that they were, in fact, by aiding and abetting the unlawful end of the conspiracy, that they're in the civil conspiracy. Because there's an agreement for an unlawful purpose. There's knowledge, and you join it or ratify it after you become aware of it. And then an affirmative step is taken to advance the conspiracy. So, Your Honor, a couple of things. I think what you're really describing there is wanting to be a joint tort-feasor relationship, which is why I think Ms. Wanna kind of gave it — tried to give it that spin. And as we talked about a moment ago, in order to establish joint tort-feasor liability, you have to have more than just knowledge. You have to have knowledge, number one, that the conduct is tortious, and number two, there has to be substantial assistance provided. And merely having an arm's-length business relationship with another party, even if that party goes and commits a tort, doesn't make the contract counterparty here, LexisNexis, a joint tort-feasor. So that's number one. Number two, of course, I don't think that argument even has been properly presented to the Court, because it was never raised in the district court, and it's not pleaded in the complaint. Your Honor mentioned the concept of ratification, and that's where I was going to a moment ago, which is that, you know, the idea of ratification is someone is out there purporting to act on behalf of a principal, right? And they're telling here Ms. Wanna, I, in my life, I'm acting on LexisNexis's or that Ms. Wanna, in dealing with my life, believed she was actually dealing with LexisNexis. And so, you know, all of these allegations about, oh, there was a DOJ complaint and whatever, you know, whatever that means, Your Honor, you can't get from point A to point Z just by relying on the fact that there were allegations as to my life. There's got to be some hook. As Judge Schultz recognized, some hook to bring LexisNexis into the picture. And all you have here is an ordinary commercial relationship whereby my life acquired certain information from LexisNexis. Well, suppose LexisNexis knew my life was making improper use of the data and was acquiring the data for that purpose. What more would the plaintiff need to show to establish that LexisNexis is liable? Well, Your Honor, I think that, again, joint tort fees or liability requires more than knowledge. It requires substantial assistance. What do you mean by substantial assistance? What more than provision of the data would be required? Your Honor, I don't think that this Court's precedence in the cases we've cited support the idea that merely having a contract whereby someone is providing information could constitute substantial assistance. Well, if that was the whole, if that's all they needed to commit the tort and you were the source of the data, what more assistance could you give? I think there could be a lot of other assistance. There could be, in some of the cases where agency relationships have been found to exist, there were direction. I'm not talking agency now. You were talking joint tort. And you said there has to be more than knowledge. There has to be substantial assistance. So my question was, why isn't the provision of the data, which is the part and parcel of the tort, substantial assistance under that? I think, Your Honor, that would fall at best within what the Supreme Court in the Matthews v. Eichhorn case called knowledge of a violation combined with inaction. So this — Well, wait. That's not necessarily true. Because what if you look at this — I'm sorry about cutting you off. But what if you look at this hypothetical and you say, I sell data that I know contains addresses to Joe. Joe turns out and kidnaps five people off the list that I provided information with, and I come to know that. Joe comes back to buy more addresses. If you still sell him those addresses, you have knowledge and you've passed that information on. And once with knowledge that that information has been used for unlawful purposes, isn't that — aren't you at that point then a joint tort freezer, even if you were completely innocent at the outset? Your Honor, I don't think that's pleaded. And I also don't agree that the hypothetical on its own would get you there. Because I think you have to have something by which the provider of the information in that hypothetical would be taking some action to accomplish to help advance the tortious result. That's the key. Well, giving the addresses that the second party needs to commit the crime. Your Honor, if I may answer Your Honor's question, again, respectfully, I don't think that merely continuing to provide information under a contract that was entered into prior to any such, you know, knowledge in this hypothetical would constitute substantial assistance on its own without any other conduct alleged to advance the tortious aim of the actor here in my life. But again, Your Honor, that's not what the complaint alleges here. That's a whole different case, Your Honor. But you wanted to argue the joint tort freezer point, so we've — Fair enough, Your Honor. I understand. Yeah. Your Honor, I see I'm out of time. Thank you, Your Honor. Thank you for your argument. Mr. Madgett, we'll hear a brief rebuttal. Thank you, Your Honor. So addressing the joint tort freezer liability issue, I think the Court was toying with the term ratification. If you examine the Witzman case, as we cited in our brief, that case specifically mentions ratification. The actual term, ratification, in the joint tort freezer context. So to use the same example, let's take this to the physical world. Supplying a bullet. What LexisNexis is arguing is that so long as there is a commercial contract in place, even though I know that man is wildly shooting into a crowd and I am providing him bullets, one bullet after another, knowing exactly what he's doing, oh, there's a commercial contracting in place that says, oh, you won't use this for illegal purposes, and therefore that somehow absolves me of the liability of continuing to hand him bullets, knowing exactly what he's doing. Nobody on the street would think that that was not tortious behavior. But when extrapolated into data and these complicated terms, which really are just the same thing as the bullet, I mean, somehow everybody loses sight of it. And that's — what is — Justice Erickson nailed this, which is what more substantial assistance could one provide than the exact data that is necessary, that is the basis of the tort? Without that data, there is no tort. There is no nothing. That data is the only thing. And without that, my life doesn't commit any torts. Lexis doesn't commit any torts. That is — that is the bullet. He's handing him the bullet, and they're firing the gun, and they continue to do it well after notice. With regard to direct — I noticed that there was no argument whatsoever on direct liability, and I just want to go back to that for one moment, because I do think that — There was argument that you didn't plead it. The argument was you pleaded an agency theory. I would differ on that. I think if you read — fully reading the complaint and, in fact, reading our brief, we specifically address — reading the — pardon me, the trial court brief, we specifically address the issue of the Community Decency Act with regard to the defamation claim. In fact, my life cannot be liable for defamation under the Community Decency Act, which exempts my life. As long as they take the data and they repost that data exactly in the same format as it was provided to them, they are actually completely immune under congressional statute, the Community Decency Act. That act protects companies such as Google and other just throughputs of data. So my life can't even be liable under that. So, of course, defamation was — must have been pleaded. It was the only way you could possibly plead it, as a direct claim. The defamation occurred at the point that my life stated to Lexis — excuse me, LexisNexis stated to my life that Ms. Wanna was — you know, had criminal records. That was defamation per se. That is defamation per se, accusing somebody of a crime in the State of Minnesota. That is defamation per se. And that occurred at the point that Lexis transmitted that data to my life, not at the point that my life resold that data to somebody else. In fact, there is no liability for my life in my life when, as accurately stated, we sued my life. We sued him right into bankruptcy, as we should have. And when, you know, when they were faced with that claim, that's exactly what they asserted. They said Community Decency Act. We just took Lexis' data. We completely reposted it, and we are not liable. And we actually said, yeah, you're right. You're not liable under the Community Decency Act. We've got to go to Lexis to do it. And now we stand here going to Lexis and going to the source after collecting all that data and information, finding, you know, finding the background information necessary to find the true bad actor in this. We find all that. We sue them. And our case gets dismissed on an agency theory. We did not plead — we did not plead agency in and of itself. The whole agency argument goes to damages. That doesn't go to the — you know, it certainly goes to damages, and we'll continue to argue it for damages purpose and joint tort fees and all these other theories for the purposes of damages. But for the purposes of liability itself, that is direct. That is directly against — it requires no input of my life whatsoever. And I see I am out of time. I'm happy to entertain any further questions. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course. Thank you, sir.